IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                        CIVIL ACTION NO. 2:24-cv-00685

**APPROXIMATELY $2,004,184.65 IN UNITED STATES CURRENCY FROM CITY NATIONAL BANK ACCOUNT ENDING IN 4556,**

        **Defendant.**

## VERIFIED COMPLAINT OF FORFEITURE

Comes now, the United States of America ("Plaintiff"), by and through its attorneys, William S. Thompson, United States Attorney for the Southern District of West Virginia, and Justin A. Marlowe, Assistant United States Attorney for the Southern District of West Virginia, and respectfully brings this Verified Complaint of Forfeiture (the "Complaint") and alleges as follows in accordance with Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and to the extent applicable 18 U.S.C. §§ 981, 983, 984, and 985, and the Federal Rules of Civil Procedure.

## NATURE OF ACTION

1. This is a civil action *in rem* brought on behalf of the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and Rule G(2), to enforce the provisions for the forfeiture of defendant properties, constituting proceeds of, or which was used or intended to be used in any manner or part to commit or to facilitate the commission of one or more violations of 18 U.S.C. §§ 287, 1347, 1349, 1956.

## **THE DEFENDANT IN REM**

2.     The Defendant Currency consists of $2,004,184.65, more or less, which is currently located in City National Bank account number ending in xxxxxx4556, in the name of Summers Medical Supply, LLC ("CNB Account").

3.     The Defendant Currency is presently in the custody of City National Bank.

## **JURISDICTION AND VENUE**

4.     Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. §§ 1345 and § 1355(a) because this forfeiture action has been commenced by the United States.

5.     This Court has *in rem* jurisdiction pursuant to: (1) 28 U.S.C. § 1355(b)(1)(A), because acts and omissions giving rise to the forfeiture occurred in this district; and (2) 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the property is located within this district.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omission giving rise to the forfeiture occurred in this district.

7.     Because the Subject Funds are not in the government's possession, custody, and control, the United States' requests that the Court of Clerk issue an arrest warrant *in rem*, upon the filing of the complaint, pursuant to Supplemental Rule G(3)(b)(1). The United States will then execute the warrant on the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

**BASIS FOR FORFEITURE**

8. Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C §§ 287 (fraudulent claims), 1347 (health care fraud), and 1349 (conspiracy to commit health care fraud), is subject to forfeiture pursuant to 18 U.S.C § 981(a)(1)(C), and any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering), or any proceeds traceable to such property, is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

9. The United States alleges that the Defendant Currency was obtained through a conspiracy to fraudulently bill health care benefit programs in violation of 18 U.S.C. §§ 287, 1347, 1349, and that said monies were laundered through bank accounts in violation of 18 U.S.C. §§ 1956 and 1957. In addition, to the extent that the funds in the CNB Account are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the funds in the CNB Account are identical property found in the same account or place as the property involved in the specified offense, rendering the CNB Account subject to forfeiture pursuant 18 U.S.C. § 984.

**FACTS**

*The Medicare Program*

10. The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were the age of 65, or order, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. The benefits available under Medicare were governed by federal statutes and regulations. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

11. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

12. Medicare was divided into four parts which helped cover specific services: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

13. Specifically, Medicare Part B covered medically necessary physician office services and outpatient care, including the ordering of durable medical equipment, prosthetics, orthotics, and supplies ("DME") that were ordered by licensed medical doctors or other qualified health care providers.

14. Physicians, clinics, laboratories, and other health care providers that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

15. To receive Medicare reimbursement, providers had to fill out an application and execute a written provider agreement, known as a CMS Form 855. The application contained certifications that the provider agreed to abide by the Medicare laws and regulations, and that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Medicare providers were given access to Medicare manuals and service bulletins describing procedures, rules and regulations.

16. CMS contracted with cgs Administrators, LLC, to receive, adjudicate, process, and pay Part B claims, including claims for DME.

*Durable Medical Equipment*

17. Medicare covered an individual's access to DME, such as off-the-shelf- ("OTS") ankle braces, knee Braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces"). OTS braces require minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fir the individual.

18. A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment or diagnosis of the beneficiary's illness or injury and prescribed by a licensed physician. In claims submitted to Medicare for the reimbursement of provided DME, providers were required to set forth, among other information, the beneficiary's mane and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment. To be reimbursed for Medicare DME, the claim had to be reasonable, medically necessary, documented, and actually provided as represented to Medicare.

19. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. For certain DME products, Medicare promulgated additional requirements that a DME order was required to meet for an order to be considered "reasonable and necessary." For example, for OTS knee braces billed to Medicare under the Healthcare Common Procedures Coding System ("HCPCS") Code L1851, an order would be deemed "not reasonable and necessary" and reimbursement would be denied unless the ordering physician documented the beneficiary's knee instability using an objective description of joint laxity determined through a physical examination of the beneficiary.

*Telemedicine*

20. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology to interact with a patient.

21. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically billed insurance or received payment from patients who utilized the services of the telemedicine company.

22. Medicare Part B covered expenses for specified telemedicine services if certain requirements were met. These requirements included, but were not limited to, that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via a two-way real time interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility—not at the beneficiary's home—during the telemedicine consultation with a remote practitioner.

23. Medicare regulations regarding telehealth concerned payment for telehealth consultation services only and did not prohibit ordering DME where the consultation itself was not billed to Medicare. However, some Medicare contractors took the position that the failure to comply with these requirements could inform their determination of medical necessity for DME ordered.

24. The practitioner will enter a billing code to indicated what type of appointment occurred with the patient. That code is sent to Medicare. If this was a new patient and the appointment was in person for a face-to-face the billing code would be 99201-99205. If this was

an established patient and the appointment was in person for a face-to-face visit the billing code would be 99211-99215.

25.     If the appointment was telehealth a billing code modifier would be attached to the visit code by adding 95 to the code. If a phone call occurred between the practitioner and the patient, that appointment would be billing coded as 99443. A phone call would not meet the requirements of a telehealth visit for prescribing DME.

## *Locust Medical*

26.     Locust Medical, LLC ("LM") is a limited liability company with a principal office address of 310 3rd Avenue, Hinton, West Virginia, located within the Southern District of West Virginia.

27.     LM was registered with the West Virginia Secretary of State on April 8, 2020. The sole member identified on the West Virginia Secretary of State's official website is George Spadaro.

28.     LM enrolled in the Medicare program on 04/24/2020, and began submitting claims to Medicare on 05/08/2020, for payment for DME purportedly provided to Medicare beneficiaries.

29.     LM ceased operations and submitting claims to Medicare on 03/13/2023, which was around the same time that LM was being investigated for healthcare fraud.

## *Summers Medical Supply*

30.     Summers Medical Supply, LLC ("SMS") is a limited liability company with a principal office address of 310 3rd Avenue, Hinton, West Virginia, located within the Southern District of West Virginia.

31. SMS was registered with the West Virginia Secretary of State on September 23, 2021. The sole member identified on the West Virginia Secretary of State's official website is George Spadaro.

32. SMS enrolled in the Medicare program on May 20, 2022, and began submitting claims to Medicare on June 14, 2022, for payment for DME purportedly provided to Medicare beneficiaries.

### *Eastern Medical Supply*

33. Eastern Medical Supply, LLC ("EMS") is a limited liability company with a principal office address of 110 Main Street, Beckley, West Virginia, located within the Southern District of West Virginia.

34. EMS was registered with the West Virginia Secretary of State on March 21, 2023. The sole member identified on the West Virginia Secretary of State's official website is George Spadaro.

35. EMS attempted to enroll in the Medicare program on 04/15/2024, but was denied enrollment because they were not in compliance with Medicare requirements at the time of their initial site visit. The site visit failed due to the following: 42 C.F.R. § 424.57(c)(4) - The supplier did not have inventory stored on site. 42 C.F.R. § 424.57(c)(12) - The supplier did not furnish contact information to beneficiaries at the time of delivery.

### *SMS fraudulent billing to Medicare*

36. Claims submitted to Medicare by SMS primarily identified Dr. Govind Seth, a family medicine practitioner in Dundalk, Maryland; Dr. Oluremi Ilupeju an obstetrics and gynecologist in Silver Spring, Maryland; and Dr. Martin Perlin, a hematologist in Mount Kisco,

New York as the referring and ordering physicians for the DME provided to Medicare beneficiaries and billed to Medicare.

37. Between June 14, 2022, and September 18, 2024, SMS submitted false or fraudulent claims to the United States through the Medicaid Program for reimbursement for DME supplies that were not medically necessary and were billed in violation of Medicare statutes, regulations and polices.

38. In 2022, 11 Medicare claims were paid to SMS where Dr. Perlin is the referring provider. The visit was billed as a phone call, not meeting the face-to-face requirement to provide DME.

39. In 2023, 2524 Medicare claims were paid to SMS where Dr. Perlin is the referring provider. The visit was billed as a phone call, not meeting the face-to-face requirement to provide DME.

40. In 2023, 1043 Medicare claims were paid to SMS where Dr. Ilupeju is the referring provider. The visit was billed as a phone call, not meeting the face-to-face requirement to provide DME.

41. In 2024, 2 Medicare claims were paid to SMS where Dr. Ilupeju is the referring provider. The visit was billed as a phone call, not meeting the face-to-face requirement to provide DME.

42. In 2024, 2264 Medicare claims were paid to SMS where Dr. Perlin is the referring provider. The visit was billed as a phone call, not meeting the face-to-face requirement to provide DME.

43. Through September 18, 2024, SMS has billed $8,806,978.31 and has been paid $3,390,588.65 because of these false and fraudulent claims.

44.　　Through September 18, 2024, SMS has billed $6,327,318.31, and has been paid $2,309,632,34 by Medicare where Dr. Perlin is listed as the referring provider from 2022 to 2024. That amount was billed to Medicare, where each patient's only appointment was billed as a phone call.

45.　　Through September 18, 2024, SMS has billed $1,536,680.00 and has been paid $683,309.49 by Medicare where Dr. Ilupeju is listed as the referring provider from 2023 to 2024. That amount was billed to Medicare, where each patient's only appointment was billed as a phone call.

*Medicare Fraud Hotline Complaints*

46.　　Between March 20, 2023, and August 9, 2024, the United States Centers for Medicare and Medicaid Services ("CMS") Benefit Integrity Unit ("BIU") received 168 fraud hotline complaints from Medicare beneficiates reporting that they had received DME from SMS that they did not need, or order and that Medicare was fraudulently billed for DME without their consent. Many of the complaints confirmed that they had never heard of SMS or the ordering physician.

47.　　Between the 168 Medicare fraud hotline complaints involving SMS and the subsequent beneficiary reviews have been unable to identify any beneficiary for whom SMS billed Medicare had a legitimate physician-patient relationship with the ordering physician or who needed the medical devices that SMS provided.

48.　　Upon review of the 168 Medicare fraud hotline complaints involving SMS, 140 were billed as phone calls only to the patient, resulting in DME being sent to the recipient.

49.　　14 of the Medicare fraud hotline complaints showed that Dr. Perlin was the authorizing doctor to prescribe DME through SMS although no telehealth visit was prescribed.

50. The remaining 4 Medicare fraud hotline complaints showed that Dr. Ilupeju was the authorizing doctor to prescribe DME though SMS although no telehealth visit was prescribed.

51. Beneficiary "SS" was interviewed on August 14, 2024, and reported that they had received two or three DME in the mail within the last year that they did not request. "SS" informed investigators that they had never had any internation with or ever even heard of the referring physician Dr. Oluremi Ilupeju or anyone associated with his practice. "SS" denied ever interacting with SMS and denied ever having a telehealth visit. Despite the lack of physician-patient relationship or encounter, SMS billed Medicare $1,200.00 for the DME provided to beneficiary "SS".

52. Beneficiary "SJ" was interviewed on August 14, 2024, and reported that they had received two DME products that they did not order or ask their doctor for. "SJ" stated that they had never heard of SMS and had never spoken to or heard of the ordering physician Dr. Martin Perlin. "SJ" denied ever interacting with SMS and denied ever having a telehealth visit. Despite the lack of physician-patient relationship or encounter, SMS billed Medicare $3,600.00 for DME provided to beneficiary "SJ".

53. Beneficiary "LR" and their child "TP" were interviewed on August 21, 2024. "LR" had never heard of SMS or ordering physician Dr. Martin Perlin. "LR" reported that they had no knowledge of SMS or ordering physician Dr. Martin Perlin. "LR" recalled being contacted by phone by someone offering her braces, but "LR" informed them that they did not need or want the medical equipment. SMS shipped "LR" several pieces of DME purportedly ordered by Dr. Martin Perlin and billed Medicare $1,800.00 for the DME.

*Recruitment and use of doctors to prescribe DME*

54. George Spadaro recruited doctors online to prescribe DME.

55. Federal agents interviewed Dr. Oluremi Ilupeju about his relationship with SMS. Dr. Ilupeju admitted that he did not see any of the patients in person or conduct a physical exam or telehealth appointment.

56. Dr. Ilupeju would be contacted by an individual who was with SMS and would have someone on the line claiming to be a patient. Dr. Ilupeju would then ask a series of question for each patient. These telephone visits were not scheduled instead Dr. Ilupeju would receive phone calls throughout the day, ranging from 3 to 10 calls a day for telephone visits from SMS. Dr. Ilupeju stated that the phone number that would call was always a different number but started with a "442" area code. Approximately 75% of the calls are a woman's voice with 25% being a man's voice. Per Dr. Ilupeju, all the voices had a Filipino accent.[1]

57. The intake form provided to Dr. Ilupeju used to determine if DME is medically necessary is sent to Dr. Ilupeju by email from the email account belonging to George Spadaro. The form has the patient's information pre-filled. If a signature from the patient is required to authorize the DME, SMS will get the patient's signature not Dr. Ilupeju.

58. Approximately 95% of patients Dr. Ilupeju speaks with during the telehealth visit wants the DME item and meets the requirements for him to prescribe it. The other 5% will question the legitimacy of the call asking if it is a scam and decline any DME

59. Dr. Ilupeju has received communications from Novitas, an interactive telehealth provider. where a patient claimed that they did not receive a telehealth visit and did not want a brace prescribed to them. Dr. Ilupeju would check his notes to prove that he did speak to someone claiming to be the patient.

---

[1] Upon information and belief, George Spadaro is currently residing in the Philippines.

60.     Dr. Ilupeju did not receive any payments from SMS. His only benefit was billing a telehealth visit and would sometimes receive a check when a patient had a Medicare Advantage Plan.

61.     CMS BIU received numerous substantially identical complaints from Medicare beneficiaries reporting that LM had billed Medicare for DME that was not medically necessary or desired. As with SMS, numerous beneficiaries were interviewed by federal agents and the beneficiaries denied that they had ever heard of LM or Dr. Govind Seth.

62.     Dr. Govind Seth was interviewed by federal agents regarding his relationship with LM. Dr. Seth admitted that he did not see any of the patients in person or conduct a physical exam or telehealth appointment. Dr. Seth reported that George Spadaro had instructed him that he could prescribe DME to Medicare beneficiaries if he had reviewed the patient's medical chart and deemed it necessary based on the medical history and the information provided.

## TRACING OF FRAUDULENT MONIES

63.     Review of the CNB Account xx4566 statements and Medicare payments made to SMS show that the payments from the fraudulent Medicare claims were deposited into CNB Account xx4566.

64.     Review of the CNB Account xx4566 statements also show that the fraudulent money obtained was laundered through the CNB Account xx4566 and into other accounts controlled by George Spadaro.

## CONCLUSION

65.     By virtue of the foregoing and pursuant to 18 U.S.C. § 981(f), all right, title and interest in the defendant properties vested in the United States at the time of the commission of the unlawful acts giving rise to forfeiture has become and is forfeitable to the United States.

WHEREFORE, the United States requests that notice of this action be given to all persons who reasonably appear to be potential claimants to the defendant property; that judgment be entered declaring the defendant properties to be forfeited and condemned to the United States of America for disposition according to law; that plaintiff be awarded its costs and disbursements in this action; and that the Court award such other and further relief as it deems proper and just, including but not limited to expenses of maintenance and protection of the defendant properties as required by 28 U.S.C. § 1921.

    Respectfully submitted,

    WILLIAM S. THOMPSON
    United States Attorney


By:    /s/Justin A. Marlowe
    JUSTIN A. MARLOWE
    Assistant United States Attorney
    WV State Bar No. 9695
    300 Virginia Street, East
    Room 4000
    Charleston, WV  25301
    Telephone:  304-345-2200
    E-mail: justin.marlowe@usdoj.gov

# VERIFICATION

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, TO WIT:

I, HHS-OIG Special Agent Adam Powers, declare under penalty of perjury as provided by 28 U.S.C. § 1746, the following:

That the foregoing Verified Complaint of Forfeiture *in rem* is based upon reports and information I personally have prepared or gathered and which have been provided to me by various law enforcement personnel, and that everything contained therein is true and correct to the best of my knowledge and belief, except wherein stated to be upon information and belief, in which case I believe it to be true.

Executed on November 26, 2024.

_____
ADAM POWERS, SPECIAL AGENT

Taken, subscribed and sworn to before me this 26 day of November 2024.



_____
Notary Public

My commission expires on March 17, 2026.